533 A.2d 1271 (1987)
Daisy MARSHALL, Petitioner,
v.
DISTRICT OF COLUMBIA RENTAL HOUSING COMMISSION, Respondent, and
William J. Davis, Inc., Intervenor.
No. 86-911.
District of Columbia Court of Appeals.
Argued June 9, 1987.
Decided December 2, 1987.
*1272 Kenneth S. Kaufman, with whom Amy L. Edwards, Washington, D.C., was on brief, for petitioner.
Victor E. Long, Asst. Corp. Counsel, with whom James R. Murphy, Acting Corp. Counsel at the time brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on brief, for respondent.
Paul D. Crumrine, Washington, D.C., entered an appearance for intervenor.
Before MACK and ROGERS, Associate Judges, and NEBEKER,[*] Associate Judge, Retired.
MACK, Associate Judge:
Petitioner Daisy Marshall seeks review of a decision of the District of Columbia Rental Housing Commission ("RHC" or "Commission"). She alleges, first, that the RHC erred in holding that a landlord may increase the rent ceiling of a vacant rental unit to the rent ceiling of a rental unit located in a different building. Second, she claims that the RHC erred in concluding that the decision of the Rent Administrator which found in favor of petitioner on the issue of rent overchargeswas not supported by substantial evidence. Lastly, she asks us to find that the RHC erred in reducing the amount of interest due on the Rent Administrator's award of damages for reduction of services resulting from petitioner's loss of air-conditioning. We affirm in part, reverse in part, and remand.

I
The RHC decision on review is a second reconsideration decision, as the RHC had twice before considered the Rent Administrator's order. In each of these prior instances, the RHC affirmed the Rent Administrator's order in full.
These proceedings began on October 5, 1981, when Ms. Marshall filed a tenant petition with the Rental Accommodations Office (RAO). She alleged that the landlord had been charging rents which exceeded the legal rent ceiling and that services had been reducedspecifically, that the air-conditioner had ceased to operate during the last week of May and was not repaired until August. After a hearing on November 5, 1981, the Administrator concluded that the landlord had charged Daisy Marshall rent in excess of the rent ceiling for her apartment. The first overcharge in 1976 was disallowed by the Rent Administrator because the landlord had not completed the required rate of return schedule. The second overcharge occurred when a vacancy rent increase was taken on the apartment in 1977, just before Ms. Marshall moved into it. The Rent Administrator noted that the substantially identical rental unit that the landlord used in raising the rent ceiling for Ms. Marshall's apartment was located in a different building than the one in which her apartment was located. Believing that the statutory language "housing accommodation" required that the rental unit used in implementing a vacancy rent increase be in the same building as the vacant unit itself, the Rent Administrator held that the 1977 vacancy rent increase was improper.[1] The Administrator ordered a rent refund of $702trebled *1273 with interest at $110.57 calculated at 5.25% on the single amount over a period of three years, for a total of $2216.57.
In regard to the reduction in service caused by the loss of air-conditioning, the Rent Administrator found that there was no air-conditioning for three months during the summer of 1981. The Rent Administrator awarded the tenant $55 per month in damages plus interest of $8.66 calculated at 5.25% over a period of one year for a total of $173.66.

A. The First Decision of the Rental Housing Commission
The landlord appealed the Rent Administrator's decision to the RHC. The landlord argued to the Commission that since both apartments were within the same multi-building housing complex, shared a common heating plant, were owned and managed by the same entities, and had the same housing registration, business license, and certificate of occupancy, the unit in the other building should be considered as located in the same housing accommodation as Ms. Marshall's unit. While the Commission recognized that it had, on other occasions, taken such factors into consideration in determining whether a multi-building housing complex should be treated as one housing accommodation for purposes of allowing a landlord to file a single hardship petition for a group of buildings, it declined to extend this interpretation of the statutory term "housing accommodation" to determinations involving vacancy rent increases. Thus, because the rental units here were in different buildings, the RHC concluded that the Rent Administrator was correct in holding that the 1977 vacancy rent increase was improper.
The Commission, however, noted that a hearing examiner had erred in taking official notice of the rent history for Daisy Marshall's apartment when it had not given the landlord the opportunity to contest any material fact of which official notice had been taken. The Commission, nevertheless, found the error harmless in view of the fact that the landlord could not show he was entitled to the 1977 vacancy rent increase, since it had already been established that the comparable unit on which the landlord based the rent increase was located in a different building.
The RHC did not address the five percent increase in rent implemented in 1976, apparently because the issue was not raised in the landlord's appeal. The RHC affirmed the Rent Administrator's decision on the reduction of services due to loss of air-conditioning.

B. The RHC's First Reconsideration Decision
When the landlord appealed the decision to this court, the RHC, on its own motion, sought a remand in order to state the reason for its divergence from a past decision which found an identical unit in a separate building could be the basis for a vacancy increase under § 208 (Pyne v. Northbrook Apartment Co., TP 325 (RAC Apr. 13, 1977)). In the reconsideration decision, the Commission once again affirmed the Rent Administrator's decision and explicitly overruled Pyne.

C. The RHC's Second Reconsideration Decision
The landlord filed another appeal with this court, and again the RHC moved for remand so that it could reconsider the case. On remand, the Commission issued the decision presently on appeal. It held unanimously for the landlord, ruling that the District's rent control legislation does not prohibit the use of comparable units in a different building within a multi-building complex where there is sufficient evidence that they are part of one, integrated, multi-building complex. In short, the Commission reinstated its 1977 Pyne decision.
The Commission reasoned that a vacancy rent ceiling adjustment is not unlawful solely because the "comparable" unit utilized is in a different building. It held that a tenant may, however, create a prima facie case of such violation by alleging and proving that the comparable unit is in a different building, and this will require the landlord to come forward with evidence "showing the various indicia of integration *1274 upon which he relies to prove that the multi-building complex should be considered a single housing accommodation." While the decision indicates that it would be the landlord's burden to show all these factors existed such that the vacancy increase qualified as an exception to the rule that such increases be taken only from units in the same building, the Commission simply reversed instead of remanding. It did so because it found that the official notice taken by the hearing examiner of rent history records was taken improperly, since the landlord had no opportunity to contest the facts of which notice was taken. Lastly, the Commission found that the hearing examiner's computation of interest on the loss of air-conditioning award was incorrect, and held that the interest should be computed over a three-month period, because Daisy Marshall was without air-conditioning for three months only.

II

A. The Vacancy Rent Increase
In its second reconsideration decision, the Rental Housing Commission determined that the statutory term "housing accommodations" in § 208 of the Rental Accommodations Act of 1975 could encompass integrated, multi-building complexes for the purpose of vacancy rent increases. An agency's interpretation of the statute and regulations it administers will be sustained unless shown to be unreasonable. Becker v. District of Columbia Department of Consumer & Regulatory Affairs, 518 A.2d 93, 94 (D.C.1986); Grayson v. District of Columbia Department of Employment Services, 516 A.2d 909, 912 (D.C. 1986); 1880 Columbia Road Tenants' Association v. District of Columbia Rental Accommodations Commission, 400 A.2d 333, 337 (D.C.1979). We defer to the RHC's reasonable construction of the statute at issue here.
Section 208 of the Rental Accommodations Act of 1975 permits a landlord to take a rent ceiling increase when a rental unit is vacant, up to the rent ceiling of substantially comparable units in the "same housing accommodation." "Housing accommodation" is defined by § 201(e) of the 1975 Act, as "any structure or building in the District of Columbia containing one or more rental units and the land appurtenant thereto."
In its first two decisions the Commission found that the plain language of the definition permitted only one meaning, namely that only "building" was intended by the words "building or structure." Ultimately, however, (in its second reconsideration decision) the Commission concluded that the definition of "housing accommodation" was ambiguous.
In construing a statute, we must first look at the language of the statute by itself to see if the language is plain and admits of no more than one meaning. Davis v. United States, 397 A.2d 951, 956 (D.C. 1979). But "[w]hether or not the words of a statute are clear is not always clear." Id. (citing Sanker v. United States, 374 A.2d 304, 307 (D.C.1977) (quoting Barbee v. United States, 392 F.2d 532, 535 n. 4 (5th Cir.), cert. denied, 391 U.S. 935, 88 S.Ct. 1849, 20 L.Ed.2d 855 (1968)). At first impression, the definition of the term "housing accommodation" seems clear enough. But as the Commission points out, its clarity is superficial. The definition of "housing accommodation" cannot be simply "building," since the plain language is building or structure. Unless "structure" were to have no meaning, it would have to refer to something in addition to "building." To read the statute so as to render the term "structure" superfluous would be contrary to the well-established rule of statutory construction that effect must be given, if possible, to every word of a statute so that no part will be inoperative or superfluous, unless the provision is the result of obvious mistake or error. Tenants Council of Tiber Island-Carrollsburg Square v. District of Columbia Rental Accommodations Commission, 426 A.2d 868, 874 (D.C.1981) (citing SANDS, SUTHERLAND ON STATUTORY CONSTRUCTION § 46.06 (4th ed. 1973)). The Commission reasons that since the Council intended that "housing accommodation" was to include more than just what was contained in a "building"because otherwise the reference to *1275 "structure" would be meaninglessit is reasonable to infer that the Council intended to include integrated, multi-building complexes.
The Commission's reconsideration decision also identifies another way in which the definition renders the term ambiguous. Observing that the words "structure" and "building" in the definition of "housing accommodation" are connected by the disjunctive term "or," the Commission concluded that the two terms are mutually exclusive. Previous decisions of the RHC have construed "structure" and "building" as alternative terms for the same entities, however. Because the terms "structure" and "building" cannot be both mutually exclusive and one and the same, the statutory definition of "housing accommodation" is ambiguous.
A legislative provision warrants closer scrutiny when its language has only superficial clarity, fails to embody legislative intent or yields absurd or unjust results. Auger v. D.C. Board of Appeals and Review, 477 A.2d 196, 211-12 (D.C.1984); Peoples Drug Stores, Inc. v. District of Columbia, 470 A.2d 751, 753-54 (1983) (limits of plain meaning principle). We agree that the definition of the term "housing accommodation" renders it ambiguous. Having rejected the "superficial clarity" of a literal reading of the term, we need examine only whether the construction chosen by the Commission to resolve the ambiguity is a reasonable one. Lee v. District of Columbia Department of Employment Services, 509 A.2d 100, 104 (D.C.1986) (citing Chevron, U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984)). We find the Commission's construction of the statute reasonable based on several grounds. First, the District of Columbia Council reenacted virtually identical statutory language after the Commission's decision in Pyne v. Northbrook, supra, which permitted a multi-building housing complex to be considered a housing accommodation for the purpose of vacancy rent increases. Second, such an interpretation is in harmony with the legislative purpose in enacting the vacancy rent increase provision. Finally, the interpretation is consistent with the construction of the term in other contexts.

1. Reenactment of Statutory Language After Pyne

The RHC's interpretation of the term "building or structure" in the Commission's second reconsideration decision allowing the term "housing accommodation" to encompass multi-building complexes actually was originally adopted by the Commission in the Pyne case in 1977. In Pyne, a number of physical and nonphysical factors supported the ruling that more than one building comprised the housing accommodation. The physical factors were that the buildings were the same size and style, were constructed at the same time, had similar facilities, a single maintenance crew, and shared one heating and hot water plant. With regard to nonphysical factors, the buildings were owned and managed by a single landlord and their income expenses and assessments were combined and treated as one in the landlord's rate of return. In addition, the buildings could not be sold separately without substantial capital improvement. Moreover, a review of the existing rent structure did not suggest that rents in one building were consistently higher. The Commission concluded that, where such physical and nonphysical facts validate comparability "it defeats the purpose of Section 208 to consider the two buildings as separate housing accommodations." While that interpretation was outstanding, the Council reenacted essentially identical statutory language.
"[R]eenactment of a statute without change in its language indicates approval of interpretations rendered prior to the reenactment.... [I]f the court interprets a statute and the legislature fails to take action to change that interpretation, it is presumed that the legislature has acquiesced in the court's interpretation." 2A SUTHERLAND ON STATUTORY CONSTRUCTION, *1276 § 45.12, at 55 (Sands 4th ed. 1985) (emphasis added; footnotes omitted).[2]
The construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong, especially when the legislative body has refused to alter the statutory language to contradict that administrative construction. Red Lion Broadcasting, Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). The Council's reenactment of essentially identical statutory language is a clear signal of acquiescence in the Commission's interpretation in the Pyne decision.

2. Interpretation Effectuates Purpose of Statute
We also find the Commission's second reconsideration decision reinstating Pyne reasonable because the interpretation of "housing accommodation" to include multi-building complexes furthers the underlying purposes and policies of the statute. Section 208 of the Rental Accommodations Act of 1975 permits a landlord to increase the rent ceiling of a vacant unit. He can elect to take a flat ten percent increase in the existing ceiling or he can raise the ceiling to that of a substantially identical rental unit in the same housing accommodation. The policy underlying § 208 is to allow landlords a fair rate of return while protecting tenants' rights and promoting the purpose of rent control. Rent increases are to be based on units which constitute a "fair rental comparison." Accordingly, the Act requires the units to be "substantially identical." Units are said to be substantially identical when they contain essentially the same square footage, same floor plan, comparable amenities and equipment, comparable locations with respect to exposure and height and are in comparable physical condition. Section 214 (b), Rental Accommodations Act of 1975.
The fact that a unit is located in the same building as the unit subject to a vacancy rent increase no doubt increases the likelihood that it will be determined "substantially *1277 identical." But this does not mean that units in another building in the same multi-building complex could not also meet the test for substantial identity. The RHC's decision here simply gives a landlord the opportunity to try and prove the units are substantially identical despite their location in separate buildings.
The RHC has carefully delimited the circumstances under which a vacancy rent increase based on a unit from another building may be taken.[3] In emphasizing the degree of identity between units as the critical factor in vacancy rent increases, the RHC has isolated the key element in the provision and eliminated an artificial limitation imposed by an interpretation allowing only same building increases. The ruling also has the salutary effect of eliminating potential inequity between owners of high-rise apartment buildings and owners of smaller, low-level apartment buildings.

B. The Existence of Substantial Evidence for the Rent Administrator's Findings
The Commission held that it was improper for the hearing examiner to take official notice of the rent history for Daisy Marshall's apartment upon the conclusion of the hearing, because the landlord did not have notice that the rent history was in issue, and therefore had no opportunity to contest its contents. We disagree. The landlord had notice of the fact that the rent history would be at issue by virtue of the tenant's petition. Daisy Marshall clearly alleged the following (1) "[t]he ceiling filed with the Rental Accommodations Office for my/our unit(s) is improper," (2) "[t]he rent increase was higher than the amount of increase which was allowed by any applicable provision of the Rental Housing Act," and (3) "[t]he rent being charged exceeds the legally calculated rent ceiling for my/our unit(s)."[4]
In addition, Ms. Marshall wrote in longhand that "[t]he rent also exceed[ed] applicable [increases] calculated since 1973. As of 1977 we are paying more than the legal amount." Further, Daisy Marshall's daughter-in-law also testified at the hearing that she had been told by RAO employees that the monthly rent should have been $267 rather than $294. Thus the landlord was sufficiently apprised of the nature of the claims brought against him, and knew that the rent history would be at issue. Moreover, the landlord did not contest the facts of which the hearing examiner took official notice when it appealed to the Commission. In fact, the landlord has never at any time provided any rebuttal to the hearing examiner's conclusions that an invalid five percent rent increase was implemented in 1976 under subsection 204(a) of the 1975 Act, and that the vacancy rent increase implemented under subsection 208(a) of that Act involved units within different buildings or structures. On appeal to the Commission, the landlord merely objected to the hearing examiner's interpretation of the term "housing accommodation."[5] We *1278 remand only on the issue of whether the rent history records of which the hearing examiner took notice were materially inaccurate or incomplete.

C. Interest Revision is in Error
The Commission's revision of interest on the award for loss of air-conditioning was incorrect and we reverse on this issue. Petitioner points out that interest should be awarded on the damages incurred from the time the air-conditioner became inoperable until the present, not just for the three months during which the loss of air-conditioning occurred. See Hinton v. Moser, TP 2774 (RHC Apr. 2, 1986); Guerra v. Shannon & Luchs Co., TP 10, 939 (Apr. 2, 1986).
Affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion.
NOTES
[*] Judge Nebeker was an Associate Judge of this court at the time of argument. His status changed to Associate Judge, Retired, on September 1, 1987.
[1] The Rent Administrator relied on the Rental Housing Act of 1980, D.C.Law 3-131, as the basis for his decision. The law in effect in April, 1977 when the vacancy increase was taken was actually the Rental Accommodations Act of 1975, D.C.Law 1-33. Section 208 of that Act provided for vacancy increases and in relevant part, was substantially the same as the 1980 Act. The language of the 1975 Act was, "... [t]he landlord may adjust the rent ceiling for such [vacant] unit to the rent ceiling applicable to any substantially identical rental unit within the same housing accommodation...." Both Acts have since been superceded by the Rental Housing Act of 1985, D.C.Code §§ 45-2501-2594 (1981). See D.C.Code § 45-2593 (1981) ("chapter shall be considered to supercede the Rental Accommodations Act of 1975 ... and the Rental Housing Act of 1980 ..."). However, it is the construction of the 1975 Act which is at issue in this case.
[2] We note that the legislature reenacted this essentially identical statutory language in 1980, several years after the Pyne decision (and, we note, several years before the decisions in Reid v. Quality Management, Inc., TP 11307 (RHC Feb. 7, 1985), aff'd, 505 A.2d 73 (D.C.1986) and Charles E. Smith Management, Inc. v. Cureton, TP 774 (RHC Aug. 30, 1984), aff'd, 492 A.2d 875 (D.C.1985)). Thus, the initial reenactment occurred when Pyne was the outstanding interpretation. The Reid and Cureton cases found a rent ceiling of a substantially identical rental unit in the same housing accommodation could not be used for the purpose of a vacancy rent increase if the comparable unit was in a different building in a multi-building complex. The decisions in Reid and Cureton were rendered after the time the case at bar had been remanded to the Commission for not providing a reasoned departure from Pyne, but prior to the time the instant case was reconsidered. Both were issued over strong dissent.

Appellant points to the fact that we do not have access to details of legislative statutory language which would indicate the legislature was actually aware of the interpretation in Pyne, and thus consciously wished to promote the multibuilding complex interpretation for purposes of vacancy rent increases. While it is true that if a party can show explicit knowledge of an outstanding interpretation by the legislative body the case for legislative intent will be very strong, the fact that no explicit discussion can be found does not generate the converse inference (i.e., that silence is equivalent to ignorance of the outstanding interpretation of the rule). See Boys Market v. Clerks Union, 398 U.S. 235, 241, 90 S.Ct. 1583, 1587, 26 L.Ed.2d 199 (1970) ("`[i]t is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law") (quoting Girouard v. United States, 328 U.S. 61, 69, 66 S.Ct. 826, 830, 90 L.Ed. 1084 (1946) (emphasis added).
In the course of the negotiating for the passage of laws and regulations in the legislature, there are so many issues and so little time, that only those that are especially controversial, that have sparked the public's ire or are in desperate need of revamping may receive the legislature's attention. Not all of the interpretations which the legislature understands to be reasonable constructions of various laws or regulations may get special attention. In fact, the percentage singled out for special mention is no doubt very small. Considering that landlords relied upon the interpretation in Pyne for three years in gauging vacancy rent increases prior to reenactment, it is more than possible that those responsible for reenacting the statutory language were well aware of the language they were reaffirming. The legislature did not in any way attempt to alter the language of the vacancy rent increase provision in those three years after Pyne. Thus, while concrete evidence that the legislature knew of the interpretation in Pyne may have greatly bolstered the argument that the legislative intent was made manifest by the reenactment, the lack of such facts does not rob the argument of all force.
[3] For example, in Daisy Marshall the Commission discussed the purpose of § 208 in terms of providing a fair rental comparison based not only on the physical factors identified in § 214(b) but nonphysical factors as well:

[M]ere physical comparability is not sufficient to insure a fair rental comparison if there are other, nonphysical factors affecting the rent of the allegedly comparable unit which are different from those affecting the vacant unit. To be properly comparable it should be under the same ownership and/or control as the vacant unit and under the same managerial scheme so that control of the movement of rents in the two units is related and the use of a given unit as a comparable is validated. Undoubtedly it was such considerations that moved the Council of the District of Columbia to provide in § 214(a) that the substantially identical unit selected had to be in the same housing accommodation.
Daisy Marshall v. William J. Davis Realty, Inc., TP 10,185 (May 21, 1986) at 10-11.
[4] These allegations were made on a tenant petition form that Daisy Marshall filled out; in order to indicate that she was alleging each, she merely had to place an "X" in the space next to each phrase, which she did.
[5] There is a portion of the tenant petition form, located beneath the heading "Miscellaneous Complaints"that allows a tenant to fill in the statutory provisions under which he or she wishes to proceed. The language reads: "The landlord ... [has] violated the provisions of Sec. ______ of the Rental Housing Act of 1980." Daisy Marshall filled in the blank with the numbers 206, 207, 209, 212, and 217. The RHC faulted her for not specifying Section 214, which pertains to vacancy rent increases. But actually the 1977 vacancy rent increase was taken under § 208 of the 1975 Act, and the form did not provide a space for alleging a violation of the 1975 Act.